CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 1/ 2010

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

KENNETH D. LIGGINS,                    )
                                       )
        Plaintiff,                     )        Civil Action No. 5:09CV00077
                                       )
v.                                     )        **MEMORANDUM OPINION**
                                       )
CLARKE COUNTY SCHOOL                   )        By: Hon. Glen E. Conrad
BOARD, et al.,                         )        Chief United States District Judge
                                       )
        Defendants.                    )

The plaintiff, Kenneth D. Liggins, proceeding pro se, filed this civil rights action under

42 U.S.C. § 1983, asserting that his rights to free speech and equal protection were violated when

the chairperson of the Clarke County School Board abruptly stopped him from speaking at one of

the School Board's public meetings and ordered him to sit down. The case is presently before

the court on the motion for summary judgment filed by the School Board and the chairperson,

Robina R. Bouffault. For the reasons that follow, the motion will be granted in part and denied

in part.

### Factual Background

The following facts are presented in the light most favorable to the plaintiff. See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that all evidence must be

construed in the light most favorable to the party opposing summary judgment).

Robina Bouffault, who currently serves as the chairperson of the Clarke County School

Board, also chaired the Board in April of 2008. As chairperson, Bouffault presides at all of the

School Board's meetings.

The School Board scheduled a special meeting for Monday, April 14, 2008. One of the items that the Board planned to consider during its closed session was the recommendation of the Acting Superintendent that Brenda Jones, an African-American principal, be reassigned to a classroom teaching position.

Liggins, who is also African-American, learned about the School Board meeting from Paul Jones, Brenda Jones' ex-husband. Mr. Jones told Liggins that the School Board "was going to demote Brenda Jones," and that the members had "already asked her to write a letter and present it to the School Board." (Liggins Dep. at 60). Mr. Jones asked Liggins to attend the meeting and Liggins agreed to do so.

The School Board meeting was scheduled to take place in the high school library, which seats approximately 50 people. However, approximately 150 people showed up for the meeting, most of whom were there to support Brenda Jones and to oppose her recommended demotion. Due to the number of attendees, the School Board moved the meeting from the library to the cafeteria.

During the meeting, following reports from various committees, the School Board invited public comment. Bouffault asked interested speakers to complete public comment cards, and advised the audience that remarks would be limited to three minutes.

Liggins signed up to speak during the public comment portion of the meeting, as did sixteen other members of the audience. Ten individuals spoke before Liggins was called to speak. Of those, nine spoke in opposition to Brenda Jones' recommended demotion, while another citizen indicated that he was "speaking about the high school" and "called for Mrs. Bouffault's resignation as chairperson." (Meeting Minutes at pg. 6).

Among the individuals who spoke before Liggins were Dorothy Davis and Paul Jones. According to the meeting minutes,[1] Davis expressed concern regarding the manner in which minorities were being considered and "asked that the School Board revisit, review, and reverse the decision to demote Mrs. Jones from her current position." (Meeting Minutes at 7). When Davis asserted that Mrs. Jones was "being undermined by a group of mean-spirited individuals in the school system," Bouffault "cautioned Mrs. Davis not to make any personal attacks." (Meeting Minutes at 7).

Paul Jones, Mrs. Jones' ex-husband, emphasized that the School Board would "regret an action against Brenda Jones," and stated that the Board's actions during the previous year-and-a-half had "placed Mrs. Jones under duress." (Meeting Minutes at 8). While Mr. Jones was addressing the School Board, the audience became particularly excited. Consequently, Bouffault "asked that Mr. Jones direct his comments to the Board so as to not excite the audience." (Meeting Minutes at 8). Jones continued speaking and concluded his remarks by asking the Board to make the right decision, and by emphasizing that he was "plac[ing] the Board on notice." (Meeting Minutes at 8).

After Mr. Jones concluded his remarks, Liggins was called upon to speak. At that time, the following exchange occurred:

Liggins:   Be it known, my name is Kenneth D. Liggins. As I sat and heard what you all have already done, it reminded me that you all did with willful intent violate Section 7 of the Civil Rights Act –

Bouffault:   Ah, Mr. Liggins –

---

[1] The School Board meeting was recorded. However, neither the recording nor a full transcript of the meeting was submitted by either side.

| | |
|---|---|
| Liggins: | Wait a minute. |
| Bouffault: | No, no, no. I'm sorry. I have to ask you to sit down. |
| Liggins: | I can speak – I'm not going to sit down. I'm going to sit down when I want to. |
| Bouffault: | You are accusing this board of an illegal act. We will not tolerate that. |
| Liggins: | If you – if you – |
| | (Voices overlap) |
| Bouffault: | I am sorry – |
| Liggins: | If you have fired her – If you have fired her – |
| Bouffault: | We have not done anything yet. We are not allowed. Mr. Liggins, please sit down. |
| Liggins: | I'm going to speak – |
| Bouffault: | Please sit down. |
| Liggins: | – and finish just like everyone else. I'm not going to sit down. |
| | (Voices overlap) |
| Bouffault: | Tom, would you please call the sheriff. |
| Liggins: | Call the sheriff. |
| Bouffault: | I want this gentleman to sit down. You will not accuse this board of an illegal act. |
| | (Liggins is speaking) |
| Liggins: | – violated civil – |
| Bouffault: | I am sorry, Mr. Liggins. |
| Liggins: | Have you not terminated her? |

| | |
|---|---|
| Bouffault: | You will not accuse us of an illegal act. |
| Liggins: | Have you not terminated her? |
| Bouffault: | She has not been terminated from anything yet. We have made no determination. We are not allowed to discuss this. I ask you please sit down. You will – |
| Liggins: | What is going on here? |
| | (Voices overlap) |
| Bouffault: | – sit down. I'm sorry. |
| | (Background speakers) |
| Bouffault: | Let me say that this Board is prohibited by law to discuss this issue. The employees themselves have the possibility of saying whatever they like. We are not allowed to respond. We are not allowed in public session to answer any of this. But let me tell you that these rumors are not all true and that as of this moment we have fired no one. |
| | (Liggins is speaking). |
| Bouffault: | We have fired no one. We have made no determination. We have not made a vote. |
| | (Liggins is speaking). |
| Bouffault: | Is that correct? Now, you need to know this, but we are not in a position to be able to respond to your questions. And I apologize for that, but we are prohibited by law from doing this. |
| Unidentified: | That was a cowardly act. |
| Bouffault: | It is not a cowardly act. |
| | (Applause). |
| Bouffault: | Are there any more? |
| | (Next speaker is called). |

(Meeting Tr. 1-5).

During his deposition, Liggins was questioned regarding his initial statement in which he accused the School Board of having violated the Civil Rights Act. Liggins testified that the statement was calculated, and that he was attempting to persuade the Board to reinstate Brenda Jones. (Liggins Dep. at 85, 95). Liggins explained that at the time the statement was made, he believed, based on comments made by other citizens at the meeting, that Jones had already been removed from her position as principal.[2] (Liggins Dep. at 84). He acknowledged that he made the statement "with conviction," and that other members of the audience became excited as he spoke. (Liggins Dep. at 95). However, according to affidavits from other members of the audience, Liggins did not act unruly when he made his initial statements. When Liggins eventually turned to walk away from the podium, he saw the Sheriff standing in the doorway to the cafeteria, but the Sheriff did not approach him.

After Mr. Liggins returned to his seat, the School Board meeting continued, and six more citizens spoke in favor of Mrs. Jones. The School Board subsequently convened in closed session and voted to retain Mrs. Jones as principal of D. G. Cooley Elementary School.

On April 21, 2008, the School Board held another public meeting. During the meeting, the Board elicited comments from citizens regarding the criteria that should be utilized in assessing the qualifications of applicants for the position of Superintendent. One of the

---

[2] During Liggins' deposition, defense counsel suggested that Liggins was the first citizen to accuse the Board of having already taken action with respect to Mrs. Jones. While neither side has provided a full transcript from the meeting, the meeting minutes suggest that other citizens who spoke before Liggins were under the impression that a final decision had already been made. For instance, Shirley Thomas "petitioned the School Board to reconsider the reassignment of Brenda Jones." (Meeting Minutes at 6). Likewise, Billy Dennis "asked the School Board to reconsider the decision to demote Mrs. Jones." (Meeting Minutes at 7). Along the same lines, Dorothy Davis "asked that the School Board revisit, review, and reverse the decision to demote Mrs. Jones from her current position." (Meeting Minutes at 7).

individuals who elected to speak was Donna Michael, a reading specialist at D. G. Cooley. Michael, who is Caucasian, began her comments by mentioning the situation involving Brenda Jones. Bouffault told Michael that she would either have to confine her comments to the subject of the public hearing or sit down. Michael conformed her comments to the topic of the meeting and was permitted to continue speaking.

### **Procedural History**

Liggins commenced this action under § 1983 on September 30, 2009. In his original complaint, Liggins named the School Board; Bouffault; the Clerk of the School Board, Thomas Judge; and three other School Board members, Jennifer Welliver, Emily Rhodes, and Janet Alger, as defendants. He asserted that the defendants violated his right to free speech under the First Amendment. He also asserted that the defendants violated his right to freely associate under the First Amendment; his First Amendment right to freely exercise his religion; and his right to equal protection under the Fourteenth Amendment.

The defendants filed a partial motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. By opinion and order entered January 29, 2010, the motion was granted in part, denied in part, and taken under advisement in part. Defendants Judge, Welliver, Rhodes, and Alger were dismissed from the case, and the plaintiff was granted leave to file an amended complaint. In his amended complaint against the School Board and Bouffault, Liggins asserted violations of his right to free speech under the First Amendment and his right to equal protection under the Fourteenth Amendment.

The School Board and Bouffault have moved for summary judgment as to the remaining claims. The court held a hearing on the motion on September 9, 2010. The motion is now ripe for review.

## Standard of Review

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

## Discussion

In his amended complaint, Liggins asserts claims against the School Board and Bouffault under 42 U.S.C. § 1983, which imposes civil liability on any person acting under color of state law to deprive another person of rights and privileges secured by the Constitution and laws of the United States. Specifically, Liggins alleges that his First Amendment right to free speech was violated when Bouffault stopped him from speaking at the April 14, 2008 meeting. Liggins also alleges that Bouffault's actions deprived him of his right to equal protection under the Fourteenth Amendment.

## I.      Claims against the School Board

Turning first to the plaintiff's claims against the School Board, the court notes that the Board, as a municipal entity, is only subject to liability under § 1983 if it causes a constitutional deprivation through an official policy or custom. Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-691 (1978). Such policy or custom "need not have received formal approval through the municipality's official decisonmaking channels to subject the municipality to liability." Riddick v. School Bd. of the City of Portsmouth, 238 F.3d 518, 522 (4th Cir. 2000). A governmental entity may also be subject to municipal liability under § 1983 "when an alleged constitutional deprivation is caused by the official actions of those individuals 'whose edicts or acts may fairly be said to represent official policy.'" Id. at 523 (quoting Monell, 436 U.S. at 694).

This is not to say that every decision by a municipal officer automatically subjects the municipality to liability under § 1983. Instead, as the United States Supreme Court explained in Pembaur v. City of Cincinnati, 475 U.S. 469 (1986):

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

Id. at 482-483.

The question of who possesses final policymaking authority for purposes of municipal liability is one of state law. Id. Under Virginia law, the School Board, as an entity, has final policymaking authority. See Va. Const. art. VIII, § 7. However, individual members of the

9

Board "have no . . . duties except such as may be assigned to them by the School Board as a whole." Va. Code § 22.1-71; see also Clarke County School Board By-Laws § 2-11 (same).

Applying the foregoing principles, the court concludes that the School Board is not subject to municipal liability in this case and, thus, will grant the motion for summary judgment as to this defendant. There is no evidence that the School Board, as an entity, embraced any policy of silencing citizens at public meetings, or that the other School Board members directly condoned Bouffault's conduct. See Collinson v. Gott, 895 F.2d 994, 1004 (4th Cir. 1990) (Phillips, J. concurring). Moreover, while one of Bouffault's duties as chairperson was to preside at the School Board meeting, there is no evidence that Bouffault had "final authority to establish municipal policy with respect to the action ordered." Pembaur, 475 U.S. at 481; see also Collinson, 895 F.2d at 1004 (Phillips, J., concurring) (holding that the president's isolated act of having a speaker evicted from a county board of commissioners' meeting could not be considered "an exercise of policy-making power by one empowered to 'make policy' for the county in the matter at issue") (citing Pembaur, supra).

The court is also unpersuaded by Liggins' argument that the other School Board members tacitly agreed with Bouffault's decision by not speaking out against her, and that such inaction by the other members subjects the School Board to municipal liability. While the United States Court of Appeals for the Fourth Circuit has held that a policy or custom may "be inferred from continued inaction in the face of a known history of widespread constitutional deprivations," Milligan v. City of Newport News, 743 F.2d 227, 229 (4th Cir. 1984), the Court has emphasized that "a municipal policy or custom giving rise to § 1983 liability will not be inferred merely from municipal inaction in the face of isolated constitutional deprivations," Id. at 230. Because the

current record contains no evidence of any known, widespread constitutional violations on the part of School Board members "comparable to that alleged as to [Liggins]," Id., the court concludes, as a matter of law, that the School Board is not subject to municipal liability for Bouffault's conduct. Accordingly, the defendants' motion for summary judgment will be granted as to this defendant, and the School Board will be dismissed from the case.

## II.     Claims against Bouffault

In moving for summary judgment on the claims against Bouffault, the defendants assert that Bouffault is entitled to qualified immunity. The defense of qualified immunity "shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Henry v. Purnell, 501 F.3d 374, 376-377 (4th Cir. 2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When a government official asserts this defense, the court must determine: (1) "whether the facts, when viewed in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right"; and (2) "'whether the right was clearly established' -- that is, 'whether it would be clear to a reasonable officer that [her] conduct was unlawful in the situation [she] confronted.'" Id. at 377 (quoting Saucier v. Katz, 533 U.S. 194, 201-202 (2001)).

The answer to both of the foregoing questions must be in the affirmative in order for a plaintiff to withstand a motion for summary judgment on qualified immunity grounds. Henry, 501 F.3d at 377. "The plaintiff bears the burden of proof on the first question -- i.e., whether a constitutional violation occurred." Id. "The defendant bears the burden of proof on the second question -- i.e., entitlement to qualified immunity." Id.

## A.    **First Amendment**

With these basic principles in mind, the court begins its qualified immunity analysis by considering whether the facts, when viewed in Liggins' favor, show that Bouffault violated his First Amendment right to free speech.  At its most general level, the First Amendment bars the government from restricting speech on the basis of its content or the message it conveys. Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 828 (1995); see also Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95 (1972) ("[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.").  While "[t]his does not mean that the government must allow all speech on all of its property at all times, . . . it does mean that when the government opens its property to private speech, it may not discriminate based upon the viewpoint of the speaker." Child Evangelism Fellowship v. Anderson Sch. Dist. Five, 470 F.3d 1062, 1067 (4th Cir. 2006).

The prohibition against viewpoint discrimination is "a constant." Id.  "Beyond this, speakers' rights depend upon how widely the government has opened its property and its purposes in doing so." Id.  In other words, the standards for determining whether Bouffault unconstitutionally restricted Liggins' speech in a public forum "depend on the nature of the forum." Steinburg v. Chesterfield Co. Planning Comm'n, 527 F.3d 377, 384 (4th Cir. 2008) (citing Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106-107 (2001)).

For instance, in a traditional public forum, such as a sidewalk, street, or park, where speakers' rights are at their apex, "[s]peakers have a right to speak free of any government-imposed restrictions on their speech unless the restrictions are reasonable time, place, and manner restrictions; are content-neutral; and are 'narrowly tailored' to serve a significant

governmental interest." <u>Steinburg</u>, 527 F.3d at 384 (citing <u>Clark v. Community for Creative</u> <u>Non-Violence</u>, 468 U.S. 288, 293, 295 (1984)). "In addition, content-based restrictions may be imposed in a traditional public forum where there is a clear and present danger that [the speech] will bring about the substantive evils that [the government] has a right to prevent, and where the restrictions are narrowly tailored to serve a compelling state interest." <u>Id.</u> (internal quotation marks omitted) (citing <u>Schenck v. United States</u>, 249 U.S. 47, 52 (1919) and <u>Child Evangelism</u> <u>Fellowship</u>, 457 F.3d at 381).

Another type of forum is the "limited public forum," which is "characterized by 'purposeful governmental action' intended to make the forum 'generally available'" for expressive activity. <u>Child Evangelism Fellowship</u>, 470 F.3d at 1067. When the government establishes a limited public forum, it "may reserve the forum 'for certain groups or for the discussion of certain topics,' but it 'must not discriminate against speech on the basis of viewpoint,' and any restriction 'must be reasonable in light of the purpose served by the forum.'" <u>Id.</u> (quoting <u>Good News Club</u>, 533 U.S. at 106-107).

In this case, it is clear from the record that the School Board's April 14, 2008 meeting constituted a limited public forum. Accordingly, a municipal entity like the School Board is "justified in limiting its meeting to discussion of specified agenda items and in imposing reasonable restrictions to preserve the civility and decorum necessary to further the forum's purpose of conducting public business." <u>Steinburg</u>, 527 F.3d at 385. More specifically, officials presiding over such meetings may "'cut off speech which they <u>reasonably</u> perceive to be, or imminently to threaten, a disruption of the orderly and fair progress of the discussion, whether by virtue of its irrelevance, its duration, or its very tone and manner.'" <u>Id.</u> (quoting <u>Collinson</u>, 895

13

F.2d at 1000 (Phillips, J., concurring)). However, "any restriction must not discriminate on the basis of a speaker's viewpoint." Id. (citing Good News Club, 533 U.S. at 106-107; Collinson, 895 F.2d at 1000 (Phillips, J., concurring)).

Viewing the record in the light most favorable to Liggins, the court concludes that Liggins has presented sufficient evidence from which a reasonable jury could find that Bouffault stopped him from speaking solely on the basis of his viewpoint and, thus, violated his First Amendment rights. As previously summarized, Liggins was the tenth person called to speak during the public comment portion of the School Board meeting. He began his remarks with the following statement: "Be it known, my name is Kenneth D. Liggins. As I sat and hear what you all have already done, it reminded me that you all did with willful intent violate Section 7 of the Civil Rights Act." Upon hearing this statement, Bouffault immediately interrupted Liggins and directed him to sit down.

Because the School Board had not yet made a final decision with respect to Mrs. Jones' employment status, Bouffault argues that she reasonably believed that Liggins' accusation of illegal conduct threatened to disrupt the orderly conduct of the meeting. However, the explanation that she now provides is not that which she offered during the actual meeting. Instead, after interrupting Liggins and directing him to sit down, Bouffault emphasized that Liggins was "accusing this board of an illegal act," and that the School Board would "not tolerate that." (Tr. at 2-3). Likewise, after ultimately directing the Clerk to call the Sheriff, Bouffault again expressed displeasure with the content of Liggins' initial statement, rather than the tone or manner in which it was made:

14

| Bouffault: | I want this gentleman to sit down. You will not acuse [sic] this board of an illegal act. |
| | |
| . . . | |
| | |
| Liggins: | Have you not terminated her? |
| | |
| Bouffault: | You will not accuse us of an illegal act. |

(Meeting Tr. at 3).

In reaching this decision, the court recognizes that Liggins became argumentative and that the audience became increasingly lively while Liggins was addressing the Board. However, it was not until Liggins was interrupted by Bouffault and told to sit down that he began to argue with her. At the point that Bouffault interrupted Liggins, he had only completed two sentences. Given the current record and the fact that it must be viewed in the light most favorable to Liggins, the court is unable to conclude that Liggins voiced his initial remarks in such a tone or manner as to threaten disruption of the orderly conduct of the meeting.[3] Consequently, the issue of whether Liggins was silenced for expressing his particular viewpoint, or because Bouffault reasonably believed that his remarks threatened to disrupt the orderly progress of the discussion, must be decided by a jury.

Having determined that there is sufficient evidence of a First Amendment violation to withstand summary judgment, the court must now determine whether Bouffault's conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person

---

[3] The court again notes that while the meeting was recorded, the recording was not submitted by either side, and the meeting transcript provides no basis upon which to gauge the tone of Liggins' initial remarks or the manner in which they were made. The court also notes that Liggins has submitted affidavits from other members of the audience which indicate that Liggins did not act unruly when he made his initial statements.

would have known." Harlow, 457 U.S. at 818. As previously stated, Bouffault bears the burden

of proving that the particular right at issue was not clearly established. Henry, 501 F.3d at 378.

Courts have explained that a right is clearly established when it has been specifically

identified so "as to leave no doubt that the challenged action was unconstitutional." Swanson v.

Powers, 937 F.2d 965, 969 (4th Cir. 1991). "This is not to say that an official action is protected

by qualified immunity unless the very action in question has previously been held unlawful; but it

is to say that in the light of pre-existing law the unlawfulness must be apparent." Hope v. Pelzer,

536 U.S. 730, 739 (2002) (internal citation and quotation marks omitted). Thus, in determining

whether a right was clearly established, the key issue is "whether it would be clear to a

reasonable officer that the conduct was unlawful in the situation [she] confronted." Saucier, 533

U.S. at 202.

To support her position that qualified immunity is appropriate, Bouffault relies on

Collinson v. Gott, 895 F.2d 994 (4th Cir. 1990), a split decision from the Fourth Circuit that

arose from a public meeting of a county board of commissioners. At the meeting, Gott, the board

president, announced that anyone who wished to speak would have two minutes, and would have

to confine their remarks to the particular issue at hand and not discuss "personalities." Collinson,

895 F.2d at 995. Collinson signed the list to speak and was scheduled to speak second. As he

began to speak, Gott deemed his initial remarks as being off the topic at hand and called him out

of order. As Collinson continued to speak, a police officer approached him at the president's

direction, and told him that he had to leave the meeting. Collinson peacefully complied and left

the hearing room.

After Collinson filed a § 1983 action in federal court, Gott moved for summary judgment on the ground that he was entitled to qualified immunity. The district court denied the motion and Gott appealed. A divided three-member panel of the Fourth Circuit reversed the district court's decision, finding that Gott was entitled to summary judgment on the § 1983 claim. Judge Phillips concluded that the appropriate question for the court was whether Gott was entitled to qualified immunity, and then answered that question in the affirmative. Judge Butzner agreed that the issue before the Court was the president's entitlement to qualified immunity, but concluded that there were genuine issues of material fact that precluded Gott from being entitled to summary judgment. The third judge on the panel, Judge Wilkinson, concluded that local government officials presiding over public meetings should be entitled to absolute legislative immunity. Because two judges concluded that Gott was entitled to immunity, albeit for different reasons, the panel reversed the denial of Gott's summary judgment motion.

In the concurring opinion on which Bouffault relies, Judge Phillips concluded that the general contours of the applicable First Amendment rights "were surely well-established" at the time of the board of commissioners' meeting, and that "a reasonable person presiding in an official capacity over a public meeting of the type here in issue must surely be charged with awareness of the general contours of the right at this level of generality." Collinson, 895 F.2d at 999 (Phillips, J., concurring). While Judge Phillips noted that "the matter bec[ame] considerably less 'settled'" when the "inquiry focuse[d] upon the more specific issue of the constitutional right's application to ad hoc parliamentary rulings by local officials presiding over called public meetings," he emphasized that none of the existing judicial decisions suggested "that one's first amendment speech rights are effectively checked at the door of any meeting called by public

17

officials to discuss matters of public concern, with the official presiding over such a meeting becoming the sole arbiter of those rights." Id. at 999-1000 (Phillips, J., concurring). Judge Phillips then summarized the "plain legal implications of the most relevant decisions" in existence at the time of the meeting, as follows:

> 1.     Speech at public meetings called by government officials for discussion of matters of public concern is entitled to normal first amendment protections against general restrictions or ad hoc parliamentary rulings by presiding officials.

> 2.     Because of government's substantial interest in having such meetings conducted with relative orderliness and fairness to all, officials presiding over such meetings must have discretion, under the "reasonable time, place and manner" constitutional principle, to set subject matter agendas, and to cut off speech which they reasonably perceive to be, or imminently to threaten, a disruption of the orderly and fair progress of the discussion, whether by virtue of its irrelevance, its duration, or its very tone and manner. This obviously contemplates that in this setting the content of speech may properly be the conscious target of state action (where it is cut off for irrelevance or manner of delivery), or its collateral victim (when it is cut off for excessive duration). But this consequence assuredly lies within well-established constitutional principles, once it is accepted, as I think we must, that disruption of the orderly conduct of public meetings is indeed one of the "substantive evils that [government] has a right to prevent."

> 3.     As indicated, official discretion here is not limitless. The limits can be found in the well-established principle that the primary concern of the no-censorship-of-content requirement is with speaker viewpoint rather than with subject matter per se. While the latter will yield fairly readily to time, place and manner restrictions, the former will but rarely, if ever, do so. Thus, while a ruling, "We will not listen to your views on capital punishment at this public hearing on rezoning," certainly must be constitutionally permissible, a ruling, "We will not listen to yours or any views favoring rezoning at this rezoning hearing," obviously would not be.

> I think, and would hold, that the general contours of the first amendment right in this specific context, as just described, must be considered to have been well-established at the critical time, for purposes of the qualified immunity inquiry.

> I would further hold as a matter of law that a reasonably competent official in Gott's position would have known that while he could, within these principles, rule Collinson out of order and evict him if he had reason to believe that necessary to avoid disruption of the orderly conduct of the meeting, he could not constitutionally do so if he had no reasonable basis for fearing disruption, or if his actual purpose was to prevent expression of Collinson's viewpoint on the reorganization issue.

Collinson, 895 F.2d at 1000 (Phillips, J., concurring) (internal citations omitted).[4]

Applying the foregoing principles, Judge Phillips ultimately concluded that the president of the board of commissioners was entitled to summary judgment on the basis of qualified immunity. In reaching his decision, Judge Phillips found that the president made a plausible showing that his motive was not to suppress a particular viewpoint, but to avoid an imminently threatened disruption of the orderly conduct of the meeting. He emphasized that the plausibility of the president's asserted motive was "strongly supported by two factors: the technical justification for the ruling following Collinson's opening comment, and, more critically, Gott's reaction to the expression by others at the meeting of viewpoints comparable to Collinson's." Id. at 1002 (Phillips, J., concurring).

Having found that there was "no genuine dispute that Gott's motive was . . . to insure [the] orderly conduct of the meeting, and not to suppress Collinson's viewpoint on the subject matter," Id., Judge Phillips turned to the ultimate question of "whether a reasonable person in Gott's position, i.e., one motivated only to insure orderly conduct of the meeting, reasonably could have believed that ruling Collinson out of order and having him evicted was not a violation of the plaintiff's constitutional rights." Id. at 1003 (Phillips, J., concurring). Judge Phillips

---

[4] This summary of the applicable law was later adopted by another Fourth Circuit panel in Steinburg v. Chesterfield County Planning Comm'n, 527 F.3d 377 (4th Cir. 2008), which was decided six weeks after the meeting at issue in this case.

readily answered the question in the affirmative and concluded that Gott was entitled to qualified immunity.

Applying Judge Phillips' concurring opinion, the defendants argue that Bouffault "reasonably perceived Liggins' speech to imminently threaten to disrupt the orderly conduct of the School Board meeting" and, thus, that the same result must be reached in this case. (Reply Br. at 4). As previously illustrated, however, a genuine issue of material fact exists concerning whether Bouffault's motive was as she now claims it to be, that is, to protect the orderly conduct of the meeting, rather than to suppress Liggins' particular viewpoint on the subject matter at hand. Unlike Collinson, where the board president's asserted motive for silencing the plaintiff was consistent with the justification provided following the plaintiff's opening comment, Bouffault's asserted basis for silencing Liggins is entirely different from that which she provided at the actual meeting. As previously stated, Bouffault emphasized, on more than one occasion, that her reason for cutting off Liggins was that he was accusing the Board of an illegal act, not that he was speaking in a manner that threatened to disrupt the orderly conduct of the meeting.

Ultimately, the court is convinced that a jury could find that Bouffault had no reasonable basis for fearing disruption, and that she silenced Liggins solely because she objected to the viewpoint he expressed. While Liggins did become argumentative during his subsequent exchange with Bouffault, the existing record, when viewed in Liggins' favor, provides no indication that his initial statement was made in such a tone or manner that an official in Bouffault's position could have reasonably believed that it threatened to incite disruption. Moreover, the record reveals that Bouffault had already warned one speaker not to make personal attacks, and another not to incite the audience. Rather than providing similar direction to

Liggins, Bouffault immediately told him to sit down because the Board would not tolerate him accusing it of an illegal act.

Because the evidence pertaining to the foregoing issues is in conflict, and because a reasonably competent official in Bouffault's position would have known that she "could not constitutionally [silence Liggins] if [she] had no reasonable basis for fearing disruption, or if [her] actual purpose was to prevent expression of [Liggins'] viewpoint," Collinson, 895 F.2d at 1000 (Phillips, J., concurring), the court concludes that Bouffault is not entitled to qualified immunity. Accordingly, the court will deny the defendants' motion for summary judgment with respect to the First Amendment claim against Bouffault.

## B.    Equal Protection

In addition to his claim under the First Amendment, Liggins asserts a claim under the Equal Protection Clause of the Fourteenth Amendment. His equal protection claim is two-fold. First, Liggins claims that Bouffault's decision to silence him at the meeting was motivated, at least in part, by his race. He also asserts a "class-of-one" equal protection claim, alleging that he was intentionally treated differently from the other speakers for no rational basis.[5]

The Equal Protection Clause of the Fourteenth Amendment states, in relevant part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Simply stated, the Equal Protection Clause "keeps governmental

---

[5] In their reply brief, the defendants argue that the class-of-one claim "should be rejected out of hand as it is not asserted in the Second Amended Complaint." (Reply Br. at 9). Having reviewed the second amended complaint in its entirety, however, the court disagrees. In the section setting forth his "second claim for relief" under the Equal Protection Clause, Liggins incorporated by reference all of the pleading's preceding paragraphs. In the preceding paragraphs, Liggins alleged facts sufficient to state a class-of-one claim. Specifically, Liggins alleged that he signed up to speak at the School Board meeting along with fourteen other citizens; that the other citizens spoke "on matter[s] of public concern, just as plaintiff was called to speak on matter[s] of public concern"; that he at no time caused any disruption; and that he was nonetheless treated differently from the other citizens who were permitted to speak at the meeting. (2d Am. Compl. at para. 12-17).

21

decision-makers from treating differently persons who are in all relevant respects alike."

Nordlinger v. Hahn, 505 U.S. 1, 10 (1992). To succeed on an equal protection claim, a plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). If the plaintiff makes this showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Id.

With these principles in mind, the court turns to the particular theories advanced by Liggins. To the extent Liggins' equal protection claim is premised on the assertion that he was subjected to race discrimination, the court concludes that Bouffault is clearly entitled to summary judgment. Liggins has offered no evidence that he was treated differently because he is African-American. The record reveals that most, if not all, of the other citizens who spoke at the April 14, 2008 meeting were also African-American, and that none of those speakers were silenced by Bouffault or asked to sit down. To the extent Liggins suggests that he was treated differently than the Caucasian educator who spoke at the subsequent School Board meeting, and that race discrimination can be inferred from the disparate treatment, his claim fares no better. It is undisputed that Liggins did not attend the subsequent meeting and, thus, has no personal knowledge of what transpired at that meeting. Moreover, he has failed to rebut the defendants' evidence indicating that he was not similarly situated to the Caucasian educator, and that race was not a factor in any disparate treatment.

On the other hand, the court is constrained to conclude that the defendants' motion for summary judgment must be denied to the extent that Liggins asserts a "class-of-one" equal protection claim against Bouffault. While the Equal Protection Clause most typically reaches

government action that discriminates against a person on the basis of a suspect classification such as race, the Supreme Court has also "recognized successful equal protection claims brought by a 'class of one.'" Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). To establish a class-of-one claim, a plaintiff must prove that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id.

To support his class-of-one claim, Liggins contends that he was similarly situated to the other citizens who spoke during the public comment portion of the April 14, 2008 meeting, that Bouffault intentionally treated him differently than the other speakers by abruptly interrupting him and forcing him to sit down, and that there was no rational basis for the difference in treatment. In moving for summary judgment, the defendants argue, as they did with respect to the claim under the First Amendment, that Bouffault reasonably believed that Liggins posed an imminent threat of disruption and, thus, that her actions were "neither arbitrary, nor discriminatory." (Reply Br. at 9). The defendants' argument, however, is defective for the same reason discussed above -- it fails to view the record in the light most favorable to Liggins. When viewed in that manner, the court concludes that a reasonable jury could find that Bouffault's initial actions, rather than being guided by concern for potential disruption, were actually motivated by a conscious desire to single out Liggins due to his expressed viewpoint. Consequently, the factual issues relating to Liggins' equal protection claim are "not the sort that may be resolved by a judge at the summary judgment stage." Willis v. Town of Marshall, 275 F. App'x 227, 236 (4th Cir. 2008) (reversing the grant of summary judgment on the plaintiff's claim that the town violated her equal protection rights by banning her from the community center used for Friday-night concerts).

Finally, because the Supreme Court has long "recognized successful equal protection claims brought by a 'class of one,'" Olech, 528 U.S. at 564 (citing cases stretching back to 1923), and since the court is unable to conclude that it was objectively reasonable for Bouffault to solely silence Liggins, Bouffault is not entitled to qualified immunity. Accordingly, the defendants' motion will be denied as to the class-of-one claim against Bouffault.[6]

## Conclusion

For the reasons stated, the motion for summary judgment filed by the School Board and Bouffault will be granted in part and denied in part. The School Board will be dismissed from the case and the case will proceed to trial on the following claims against Bouffault: the First Amendment claim, and the class-of-one claim under the Equal Protection Clause of the Fourteenth Amendment.

---

[6] In reaching this decision, the court notes that there may be other arguments which would support the grant of summary judgment on the class-of-one claim against Bouffault. However, in this case, the defendants have only argued that Bouffault believed that Liggins posed an imminent threat of disruption, and that, given this asserted belief, a reasonable official in her position would not have known that her actions were unlawful.

In Engquist v. Oregon Dep't of Agriculture, 553 U.S. 591, 128 S. Ct. 2146 (2008), the Supreme Court recently considered the question of whether the class-of-one doctrine can be applied in the context of public employment. In answering the question in the negative, the Court reasoned that "[t]here are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments," and that "[i]n such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." Engquist, 128 S. Ct. at 2154. Although the Supreme Court noted that "this principle applies most clearly in the employment context," Id., lower courts "have applied Engquist to bar class-of-one claims in connection with discretionary decisions made outside the government-employee context." Casciani v. Nesbitt, 659 F. Supp. 2d 427, 455-456 (W.D. N.Y. 2009) (citing cases). Because officials presiding over public meetings must exercise discretion in setting agendas and ensuring that such meetings are conducted in an orderly fashion, one could argue that the analysis in Engquist forecloses a class-of-one claim arising from the type of discretionary decisionmaking at issue in this case. However, because the Fourth Circuit has yet to decide the reach of Engquist outside the public employment context, and since neither side has addressed the decision's application, the court has limited its analysis to the defendants' arguments, and to whether the evidence in the existing record is sufficient to survive summary judgment under Olech.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to the plaintiff and all counsel of record.

ENTER: This 17th day of September, 2010.

_____
Chief United States District Judge